[670 NYS2d 254]

THE PEOPLE OF THE STATE OF NEW YORK, Respondent, v AALIA
DE SARNO, Appellant.

Third Department, March 12, 1998

## APPEARANCES OF COUNSEL

*Ira M. Pesserilo,* Ithaca, for appellant.

*George M. Dentes, District Attorney* of Tompkins County, Ithaca *(Marcia J. Cunningham* of counsel), for respondent.

### OPINION OF THE COURT

CREW III, J.

On September 13, 1995, an undercover State Police Investigator approached defendant, Gerald Alexander, and two other men in front of a residence located at 414 Madison Street in the City of Ithaca, Tompkins County. The Investigator asked one of the unidentified men for cocaine but was refused because the man did not know him. The second unidentified individual, however, indicated that he knew the Investigator and removed several packets of cocaine from his pocket. Alexander interrupted this transaction, telling the man not to sell to the Investigator. The Investigator then approached defendant, who engaged in a brief conversation with Alexander and then sold the Investigator a bag of cocaine for $20. As a result, defendant and Alexander were indicted and charged with criminal sale of a controlled substance in the third degree. Additionally, defendant was charged with criminal possession of a controlled substance in the third degree.

During the ensuing proceedings, defendant was represented by John Rowley and Alexander was represented by Benjamin Darden. Shortly before trial, defendant applied for permission to substitute Darden as her retained counsel in place of Rowley. Rowley expressed his dire concerns about such substitution, advising County Court that he had written to his client indicating that the substitution would not be in her best interest and warning that he could envision no decision more detrimental to her interest. The District Attorney likewise expressed a pointed concern regarding the proposed joint representation, specifically alluding to defenses such as agency and coercion which would be diametrically opposed to Alex-

ander's interest.[1] County Court thereafter held an in camera *Gomberg* hearing (*People v Gomberg*, 38 NY2d 307), at which time Darden assured the court that his dual representation presented no conflict in that Alexander had no role in the alleged transaction, as defendant was coerced into selling the drugs by someone other than Alexander. Both defendant and Alexander then expressed their desire to be represented by Darden in spite of any potential for conflict.

Following a jury trial, at which defendant testified that a third person had forced her to engage in the sale in question and that Alexander had no involvement therein, defendant was found guilty of criminal sale of a controlled substance in the third degree and criminal possession of a controlled substance in the third degree. Alexander was found guilty of criminal sale of a controlled substance in the third degree. Defendant was then sentenced to indeterminate concurrent terms of imprisonment of $3^{1}/_{3}$ to 10 years.

Following her conviction, defendant moved pursuant to CPL 440.10 to vacate the judgment of conviction, which motion was denied without a hearing. This Court then granted defendant permission to appeal from said denial. Defendant's sole contention on both her direct appeal and her appeal from the denial of her CPL 440.10 motion is that her constitutional right to effective assistance of counsel was violated because of a conflict of interest in the joint representation by Darden.

In support of her CPL 440.10 motion, defendant proffered a tape recording of a conversation between her and certain City of Elmira police officers made subsequent to her conviction but prior to sentencing.[2] In the taped interview defendant asserts, *inter alia*, that she had told her first attorney, Rowley, that Alexander forced her to sell cocaine to the Investigator. She further stated that Alexander had threatened her, at gunpoint, not to implicate him in the crime and that Alexander had arranged for her representation by Darden and had supplied Darden with her retainer from the proceeds of drug sales.

1. We note that unlike the dissent, we do not view the People's position on appeal as inconsistent with or antipathetic to their position at the time substitution was sought. Rather than abrogating their view that the proposed substitution presented a "patent" conflict of interest, they here assert that defendant clearly was made aware of the potential conflict and knowingly and voluntarily waived it.

2. Defendant failed to appear at her originally scheduled sentencing and a bench warrant was issued for her arrest. Apparently that warrant was executed by members of the Elmira Police Department, who interviewed defendant prior to turning her over to Tompkins County authorities.

Finally, she claimed that the events about which she testified at trial were perjurious and concocted by Darden.

Defendant's presentence statements, as well as her affidavit and that of her appellate counsel, if true, suggest that she may have been coerced into accepting the joint representation by Darden. Additionally, a letter written to defendant by Alexander while in prison advising her that he had retained an attorney to represent her on appeal and directing her to discharge her assigned appellate counsel lends further support to that contention. In these circumstances, we are of the view that while County Court conducted an appropriate *Gomberg* inquiry and satisfied itself that defendant, at that point in time, had made an informed decision to proceed with Darden as counsel despite the potential for conflict, the court erred in denying defendant's CPL 440.10 motion without a hearing. In our view, defendant raised a viable issue as to whether her waiver of the potential conflict was voluntary, thereby requiring a hearing, at the conclusion of which a factual determination concerning voluntariness could be made. Accordingly, the matter must be remitted to County Court for this purpose. Assuming County Court determines that the purported waiver was involuntary, it then will be necessary to determine if there was in fact a conflict of interest.[3]

MIKOLL, J. P. (dissenting). I respectfully dissent.

Because I believe that defendant did not receive the effective assistance of counsel, I would reverse and order a new trial.

Defendant and her codefendant, Gerald Alexander, were charged with criminal sale of a controlled substance in the third degree based upon a sale of cocaine to an undercover State Police Investigator.[1] On September 13, 1995 at approximately 8:08 P.M., the Investigator approached a group of four individuals, including defendant, Alexander and two other men, in front of a house on Madison Street in the City of Ithaca, Tompkins County. He asked one of the unidentified men for $20 worth of cocaine, but the man refused, indicating he did not know the Investigator. The second unidentified man then indicated he did know the Investigator, and took a quantity of cocaine out of his pocket to sell to him. Alexander interrupted

---

3. We note that the evidence presented at trial on behalf of defendant and Alexander was precisely as portrayed by Darden at the *Gomberg* hearing and unless untrue, as claimed by defendant, did not constitute a conflict.

1. Defendant was also charged with criminal possession of a controlled substance in the third degree.

the second male before the transaction was made, directing him not to serve the Investigator, and pointed instead to defendant, stating "let her do it". The Investigator then approached defendant, who turned away from him, had a brief conversation with Alexander, and then turned back to the Investigator and sold him a bag of cocaine for $20, stating "Now you can say you bought it from me."

Following their indictment on September 27, 1995, defendant and Alexander were assigned counsel: John Rowley was assigned to represent defendant and Benjamin Darden was assigned to represent Alexander. On January 2, 1996, the date originally scheduled for trial,[2] County Court was presented with a consent to substitution of attorney form executed by defendant, Alexander and Darden, whereby Rowley would be relieved as counsel for defendant and replaced by Darden, on a retained basis, who would then represent both codefendants. Rowley advised the court that he had serious concerns about the proposed substitution of counsel and had expressed them in letter form to his client. In this letter, Rowley strongly cautions defendant that substituting Darden would not be in her best interest, and in fact warns that he could envision no "decision more detrimental to your interest".

The District Attorney expressed equally strong, and more specific, concern about the proposed joint representation. He cited lines of defense, such as agency and duress, "which do put [defendant] and Mr. Alexander at odds". He further noted defendant's young age, her minimal criminal history and the fact that the People's theory was that Alexander was the "kingpin" of the operation. He also raised questions concerning the financial arrangements leading up to defendant's retaining of Darden, speculating that Alexander had financed and orchestrated the change for his own purposes, noting that Alexander raised bail quickly, drove a very nice car [a Saab] and stated "I have every reason to think he makes a lot of money as a drug dealer". He concluded by asserting that "there may be situations where the conflict is so palpable that even though the Defendants want it, the Court perhaps should not allow it. * * * [I]f that's the law, then I think this might be just such a case."

County Court then questioned Darden and the two defendants in chambers, with all three individuals present through-

---

**2.** Unrelated to the substitution of counsel, the trial date was changed from January 2, 1996 to January 16, 1996.

out the inquiry. Darden indicated that no conflict existed in the proposed dual representation because of the defense he intended to employ: that Alexander had no role whatsoever in the transaction and that while defendant did in fact sell the drugs to the Investigator, she did so under duress from a drug dealer to whom she was indebted and who had beaten her in the past. The court then questioned defendant and Alexander as to whether they were in agreement with the defense outlined by Darden and whether they were comfortable with the joint representation. Receiving affirmative responses, County Court found informed consent and permitted the substitution.

At trial, Alexander testified that he had nothing to do with the sale of drugs to the Investigator. He corroborated the officer's testimony that one of the men had offered to sell to the Investigator, but he claimed that he exhorted that person not to sell drugs in front of his (Alexander's) house. He said that defendant then turned to him and asked him what she should do, and that he replied that he did not care what she did as long as she did not do it in front of his house. Alexander said that defendant then approached the Investigator but that he did not see what transpired.

Defendant testified that Alexander had nothing to do with the transaction and that she sold the drugs to the Investigator because she was directed to do so by a "Tim Morris" who was present and who had previously threatened her life unless she paid a debt of $125.

Both codefendants were convicted as charged. Defendant failed to appear for sentencing, and was subsequently arrested on a bench warrant in the City of Elmira, Chemung County. She was interviewed by the Elmira Police and made a taped statement concerning a variety of matters, including this case. She indicated that she was coerced by Alexander and Darden to agree to joint representation and to fabricate the version of events to which she testified at trial. She further indicated that, contrary to the representations made by Darden to County Court at the time of the proposed substitution, Alexander had paid $2,500 in cash (from drug sales) for her representation by Darden and that she had been forced to lie to protect Alexander.

When defendant was returned to County Court on the warrant, the prosecutor apprised the court of the substance of defendant's interview with the Elmira Police and the fact that it had been tape-recorded. Defendant was questioned about these accusations, in the presence of Darden, and was asked,

"Do you recall making any such statements to [the Elmira Police]?", to which she replied, "Yes." She was then asked whether she "contested" the representations made by the prosecutor and she indicated that she did not, but that "there's a lot more to it". Pressed as to whether she wished to continue being represented by Darden, she replied repeatedly that she did not know, that she was "really confused" and that perhaps she should talk to someone else. Defendant continued to express uncertainty about how to proceed; she would not unequivocally state that she wished to proceed with or without Darden. County Court indicated that in the absence of an unequivocal protest by defendant, it would proceed with Darden as her counsel. Following denial of a posttrial motion made on her behalf by Darden, defendant was sentenced to an indeterminate sentence of $3^{1}/_{3}$ to 10 years' imprisonment.[3] A notice of appeal was duly served and filed.

Defendant's appellate counsel filed a motion pursuant to CPL 440.10 seeking to vacate defendant's conviction upon the ground that she was denied effective assistance of counsel due to Darden's joint representation. No hearing on the motion was held, although counsel provided County Court with a copy of the tape-recorded conversation between defendant and the Elmira Police. While the court indicated that it would consider the tape recording, it is unclear from the record and the court's decision denying the motion whether it listened to the tape. In the taped interview with the police, defendant indicates, among other things, that she had told her first attorney, Rowley, the truth about the criminal transaction, which was that she was coerced into selling to the Investigator by Alexander. She further stated that in mid-November 1995, she was threatened at gunpoint by Alexander not to implicate him in the crime and that on or about December 29, 1995 he supplied the retainer paid to Darden from the proceeds of drug sales. She claimed that the story testified to by Alexander and herself was concocted by Darden, with certain details, such as the name "Tim Morris", being supplied by Alexander.

Included in the CPL 440.10 motion was a letter written from prison by Alexander for transmission to defendant, in which he directs her to discharge her assigned appellate counsel. He states that he has retained appellate counsel for her, but "she is not to attempt contacting the attorney. She will be contacted in the very near future by the attorney."

---

**3.** The sentence imposed on defendant was identical to that imposed on Alexander, whom the prosecution characterized as the "kingpin" of the operation and a major drug dealer.

Also included in the CPL 440.10 motion is a letter from defendant's original counsel, Rowley (now a City Court Judge in Ithaca), confirming that defendant had told him that Alexander was the main actor in the sale to the Investigator. He also details considerable efforts he undertook to obtain enhancement of the audiotape of the body wire of the drug transaction, in an effort to obtain evidence to support defendant's position. He indicates that when Darden was substituted as defendant's counsel, he provided Darden with information as to his efforts concerning the tape. Rowley noted his concern "both with Mr. Darden's joint representation and with his apparent failure to take any further steps to secure the tape enhancement, an issue that could have potentially been very beneficial to [defendant], although potentially very detrimental to Mr. Alexander".

The record amply demonstrates that defendant did not receive the full measure of effective assistance of counsel guaranteed by the State and Federal Constitutions. This constitutional standard requires, in addition to reasonable competence, that counsel's representation be "conflict-free", i.e., that his or her devotion to a client's best interest be " ' "single-minded" ' " (*People v Ortiz*, 76 NY2d 652, 656; *People v McDonald*, 68 NY2d 1; *People v Salcedo*, 68 NY2d 130, 135). "A lawyer simultaneously representing two clients whose interests actually conflict cannot give either client undivided loyalty" (*People v Ortiz, supra*, at 656; *People v Wandell*, 75 NY2d 951; *People v McDonald, supra*; *People v Mattison*, 67 NY2d 462). Thus, where a conflict has demonstrably impacted on the conduct of a defense, the client cannot be said to have received effective assistance of counsel (*see, People v Ortiz, supra*).

Now defending the very determination they vigorously opposed below, the People contend that defendant knowingly and voluntarily accepted the risks of joint representation, including the admonition by her former attorney that "you are practically insuring that you will be convicted", a decision characterized by the prosecutor as "crazy".

While I may prefer the People's original view, that some conflicts are so "palpable" that they should not be permitted in spite of the professed wishes of the parties, I perceive sufficient ambiguity in the relevant authority to preclude such a holding. On the one hand, it has been held that "[t]he object of the

[*Gomberg*][4] inquiry is not to determine whether the defendant should be permitted to waive his right to conflict-free counsel. The decision whether to waive the right is for the defendant to make * * *. The court's role is simply to insure through adequate warnings that the defendant's decision has been made with awareness of his risks and the potential risks" (*People v Salcedo*, 68 NY2d 130, 135, *supra* [citations omitted]).

On the other hand, the Court of Appeals has held that the argument that "a defendant has the constitutional right, once an attorney has been retained or assigned, to determine whether such attorney may continue to represent him * * * is too categorical a description of a defendant's right" (*People v Hall*, 46 NY2d 873, 875). In *People v Hall* (*supra*), the defendant's counsel had been removed by the trial court, over the defendant's objection, because of a conflict that arose on the eve of trial due to a relationship between the defendant's counsel and a prosecution witness. The Court of Appeals said that while an "established attorney-client relationship" should not be lightly disturbed, it was permissible to do so where continuation of the representation would result in unfair prejudice (*id.*, at 875). More recently, in *People v Ortiz* (76 NY2d 652, *supra*), the Court of Appeals reversed a conviction based upon counsel's divided loyalties to the defendant and a former client who testified at the defendant's trial. Rejecting the argument that the conflict had been waived by the defendant's " 'advised consent' ", the Court alluded to, but was not required to reach, the question of whether such a conflict could ever be waived, finding inadequate disclosure "[e]ven if the conflict could have been waived" (*id.*, at 657, n 2).

Given this ambiguity, guidance is found in the analogous situation where an accused wishes to waive his right to counsel and proceed *pro se*. In such event, our law recognizes on the one hand that " 'even in cases where the accused is harming himself by insisting on conducting his own defense, respect for individual autonomy requires that he be allowed to go to jail under his own banner if he so desires and if he makes the choice "with eyes open" ' " (*People v McIntyre*, 36 NY2d 10, 14, quoting *United States ex rel. Maldonado v Denno*, 348 F2d 12, 15; *see, People v Vivenzio*, 62 NY2d 775). On the other hand is "the countervailing interest of society in the equally powerful ideal that our criminal justice system must determine the truth or falsity of the charges in a manner consistent with fundamen-

---

4. *People v Gomberg*, 38 NY2d 307.

tal fairness" (*People v McIntyre, supra,* at 14). Resolution of this conflict is envisioned by requiring the trial court to conduct a thorough, searching inquiry to ensure that an accused's waiver is "unequivocal, voluntary and intelligent" (*People v Slaughter,* 78 NY2d 485, 491; *see, People v Sawyer,* 57 NY2d 12, 21). In addition to specific questions appropriate under the circumstances of the particular case, such an inquiry would properly extend to a defendant's age, education, occupation and previous experience with the criminal justice system (*see, People v McIntyre, supra,* at 17).

The focus, therefore, must be upon the validity of defendant's waiver of the conflict, which is in turn dependent upon the sufficiency of the inquiry that preceded it, presenting a question of law (*see, People v Caban,* 70 NY2d 695, 697). It is noted that defendant replied affirmatively when County Court inquired as to whether she understood that there was "some risk" involved in the defense outlined by Darden, i.e., admitting that she in fact sold the cocaine but claiming that it was under duress at the hands of a third person, and that she likewise replied affirmatively when asked whether she was "comfortable" with her decision to be represented by Darden.

I am far from convinced, however, that the inquiry was adequate under the circumstances or that the waiver can be deemed intelligent, voluntary and unequivocal. Certainly, the res gestae of the transaction revealed that defendant's interest was clearly adverse to Alexander's interest, creating a blatant conflict in their respective positions. Considering this objective fact together with the contention of the prosecutor that Alexander was the "kingpin" of the operation, the concerns of defendant's assigned counsel based upon his familiarity with the case and the dubious financial arrangements[5] attendant to this indigent defendant's retaining her codefendant's counsel (who indicated that he would then be willing to represent Alexander "*pro bono*", to avoid complications in billing the Assigned Counsel Program), a much more thorough, probing inquiry was

---

5. In articulating his strenuous opposition to the joint representation, one of the questions posed by the District Attorney was "[I]s there anything just about this particular financial arrangement that's coercive?" During trial, the prosecutor repeatedly attempted, unsuccessfully, to raise the issue in cross-examining Alexander. At one point, he said, "I intend to ask the witness if he's paying for the legal representation of the co-defendant. * * * *It appears Mr. Alexander is the one with the money here and he's paying for a joint defense which is tailored to his best interests and is intended to convict [defendant]*" (emphasis supplied).

required. The limited questioning in chambers was preceded by a lengthy, almost preemptive declaration by Darden.

Moreover, that defendant was questioned in the presence of Alexander and Darden, after her own assigned counsel had already been dismissed, was hardly conducive to a true determination of the voluntariness and informed nature of her seemingly self-destructive action.[6] Just as "there is no prescribed format or catechism that the court must follow" (*People v Lloyd*, 51 NY2d 107, 112), the trial court's *Gomberg* inquiry must be sensibly and sensitively adapted to the particular factual scenario presented, the full context and nuances of which the trial court is in the best position to fully apprehend, in order to faithfully discharge its responsibility to ensure that a defendant receives effective legal representation (*see, People v Macerola*, 47 NY2d 257, 261). I do not share the majority's view that the inquiry was sufficient under the circumstances.

There can be little doubt that the conflict inherent in the dual representation in this case impacted adversely on defendant's defense. The testimony given by defendant was designed to benefit no one but Alexander. Under no rational view could her admittedly perjured testimony be viewed as benefiting herself. Not only did she implicate herself in the sale, she advanced a story requiring the jury to accept that portion of the Investigator's testimony that concerned her and to reject that portion which implicated Alexander. In contrast, the facts as testified to by the Investigator were not inconsistent with defendant's position that she sold to the investigator at the direction of, and as a result of coercion by, Alexander. Indeed, as noted, the People cited these available defenses, i.e., agency and duress, in their opposition to the substitution below. Had she testified at trial to what she now acknowledges to be the truth (and which she claims she had told Rowley from the start), the jury would not have been presented with this conflicting testimony. It is difficult to conceive of an explanation for her actions and her testimony that is inconsistent with the claims made in the tape-recorded interview and in her moving papers on the CPL 440.10 motion. Nor is it possible to imagine her actions facilitated, or testimony elicited, by any attorney other than one compromised by severely divided loyalties.

---

6. I take a similar view of the procedure employed upon defendant's return on the bench warrant, prior to her sentencing. It is difficult to apprehend the value of having questioned defendant about her tape-recorded allegations, serious and sensitive as they were, in the presence of the very individual against whom a portion of them was directed.

I would likewise reject the People's remaining arguments. They contend that defendant's moving papers acknowledging the accuracy of the People's version of events at trial preclude the relief requested because she has, in effect, acknowledged that she is guilty. This argument fails for two reasons: first, it would require holding abridgement of so fundamental a right as that guaranteed by the Sixth Amendment and our State Constitution is, in effect, harmless error simply because the very same facts underpinning such a finding also constitute evidence of guilt. Not only do I doubt that so grievous a denial of the right to effective assistance of counsel could ever be harmless error (*see, e.g., People v Slaughter*, 78 NY2d 485, *supra*; *People v Hilliard*, 73 NY2d 584; *People v Felder*, 47 NY2d 287), but, more narrowly, it is not an inexorable leap from factual agreement to legal guilt. Presumably the prosecution's view of the viability of the defenses of agency and duress was premised upon the factual scenario it advanced, and defendant's acknowledgment of this scenario does not vitiate the possibility of these defenses being successfully raised.

While the majority finds County Court's *Gomberg* inquiry sufficient and, therefore, concludes that reversal is not indicated as a matter of law, it would remit for a hearing on the voluntariness of defendant's waiver. It is my view that a hearing is unnecessary as the complete record before us is sufficient upon which to determine that defendant's waiver was not voluntary.

MERCURE, WHITE and YESAWICH JR., JJ., concur with CREW III, J.; MIKOLL, J. P., dissents in a separate opinion.

Ordered that the decision is withheld, and matter remitted to the County Court of Tompkins County for further proceedings not inconsistent with this Court's decision.